U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

SEP 25 2015

CLERK, U.S. DISTRICT COURT
By _____ MAC
Deputy

**SEALED**

# United States District Court

_____ DISTRICT OF _____ TEXAS _____

| | |
|---|---|
| **In the Matter of the Search of**<br>(Name, address or Brief description of person, property or premises to be searched) | **APPLICATION AND AFFIDAVIT**<br>**FOR SEARCH WARRANT** |

405 Bryan Drive, Arlington, Texas 76011

**CASE NUMBER:** 3:15-MJ-

3-15MJ708-BF

I __Cynthia M. Roberts__ being duly sworn depose and say:

I am a(n) <u>Special Agent with the Social Security Administration (SSA) Office of the Inspector General (OIG)</u> and have reason to believe that on the person of or __XX__ on the property or premises known as (name, description and/or location)

405 Bryan Drive, Arlington, Texas 76011

in the ___NORTHERN___ District of _____TEXAS_____ there is now concealed a certain person or property, namely (describe the person or property to be seized)

(SEE ATTACHMENT A).

**which is** (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
property that constitutes evidence of the commission of a crime, contraband, the fruits of crime, and is, otherwise, criminally possessed, **concerning a violation of Title __42__ United States code, Section(s) __1383a(a)(3)__** . The facts to support a finding of Probable Cause are as follows:

(SEE ATTACHED AFFIDAVIT OF Special Agent Cynthia M. Roberts).

Continued on the attached sheet and made a part hereof.   XX Yes __ No

_/s/ Cynthia M. Roberts_
**Signature of Affiant**
Cynthia M. Roberts
Special Agent, SSA OIG

Sworn to before me, and subscribed in my presence

__September 25, 2015__           at      __Dallas, Texas__
**Date**                                   **City and State**

**PAUL D. STICKNEY**
**United States Magistrate Judge**                  _/s/_
**Name and Title of Judicial Officer**              **Signature of Judicial Officer**

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Cynthia Roberts, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the residence of DOREEN MITCHELL and JOHN MITCHELL, located at 405 Bryan Drive, Arlington, Texas, 76011, hereinafter "PREMISES," for certain things particularly described in Attachment B.

2. I am a Special Agent (SA) with the U.S. Social Security Administration (SSA), Office of Inspector General (OIG), and have been since November 2012. I have been a Special Agent with other federal agencies since September 1997. The statements contained in this affidavit are based upon my investigation, information provided by other law enforcement personnel, and on my experience, and training as a Special Agent.

3. In order to show a violation of 42 U.S.C. § 1383a(a)(3), Concealing a Disqualifying Event from the Social Security Administration, the government must provide probable cause as to each of the following elements:

> First: That an individual received Supplemental Security Income payments;
>
> Second: That that individual had knowledge of an event affecting his initial or continued rights to SSI;
>
> Third: That that individual knowingly concealed or failed to disclose this event to the Social Security Administration; and
>
> Fourth: That that individual concealed or failed to disclose this event to the Social Security Administration with the intent to fraudulently secure payment of SSI in an amount greater than was due him or when no payment of benefits to him was authorized.

4. The SSA is an independent agency of the executive branch of the United States. The SSA is responsible for administering programs under the Social Security Act, codified at Title 42, United States Code, Section 301, et. seq. Relevant to the instant affidavit, these programs include the Supplemental Security Income program for the Aged, Blind, and Disabled under Title XVI of the Social Security Act (hereinafter "SSI Program"). The SSI program, which is funded through general tax revenues of the United States, provides monthly cash benefits to individuals who are medically "disabled" within the meaning of the Title XVI and who, in addition, are eligible for the program on the basis of financial need.

5. The ability of the SSA to properly make initial determinations as to an applicant's medical and financial eligibility for the SSI program is directly dependent upon the SSA's access to accurate and current information regarding that applicant. Moreover, if

an applicant is initially found to be eligible, and therefore becomes an SSI recipient, the SSA's ability to properly determine that recipient's continuing eligibility, and the correct monthly benefit due that recipient, likewise is directly dependent upon the SSA's ongoing access to accurate and current information regarding that recipient.

6. The SSA requires disabled SSI recipients to advise the SSA of any improvements in their medical condition, their return to work of any kind, and any changes in their income, resources, address, living arrangements, family size or composition, family income or resources, or absences from the United States for thirty consecutive days or more. The SSA also requires SSI recipients to periodically complete various forms and questionnaires as a means of updating eligibility and benefit level information. Like the initial application, these forms and questionnaires again notify the recipient of his or her continuing responsibility to notify the SSA of any changes in his or her condition.

7. A representative payee is an individual approved by the SSA to manage a beneficiary's funds to ensure that his needs are met. Representative payees are typically named to receive benefits on behalf of a beneficiary who is incompetent, either by age or disability. In cases where a beneficiary is appointed a representative payee, that representative payee is responsible both for using all funds paid for the benefit of that beneficiary for his daily needs and promptly informing the SSA if the beneficiary's condition improves or he returns to work.

8. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

9. Probable cause exists to believe that evidence, fruits, or contraband can be found on the PREMISES related to an investigation that Michael Mitchell, Sonny Mitchell, Doreen Mitchell and John Mitchell knowingly participated in a scheme to defraud the Government related to SSA benefits in violation of 42 U.S.C. § 1383a(a)(3). If, at any time, I make reference to an individual named "Patrick Rena," this is truly a reference to John Mitchell, who often uses the identity of Patrick Rena when conducting Social Security related business.

10. As background, Doreen Mitchell was issued Social Security number (SSN) 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 in October 1972. Between 1972 and 1981, Doreen Mitchell changed the name on her Social Security card to Dinah Adams, Doreen Adams, and back to Doreen Mitchell, and received replacement Social Security cards in 1979 and 1981.

10. John Mitchell was issued SSN 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 in January 1974. He received two replacement Social Security cards in 2010 under his same name.

11. SSA Area Operations Analyst Troy Gardner conducted a name search in the SSA database and was unable to locate anything for "Patrick Rena." Patrick Rena has used SSN 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, which was issued by the Commissioner of Social Security to Kim Byungkeun in November 1992. Accordingly, the identity of Patrick Rena is a fraudulent identity.

12. Relevant to the instant search warrant affidavit, beginning in or around 1978, Doreen Mitchell and John Mitchell made a series of representations to the SSA, more fully described below, that caused the SSA to believe that not only was Doreen Mitchell more mentally impaired than she truly was, but Doreen Mitchell's sons, Michael Mitchell and Sonny Mitchell, were also more mentally impaired than they truly were. Based on these representations, the SSA concluded that Doreen Mitchell, Michael Mitchell and Sonny Mitchell were eligible for SSI benefits. Additionally, since May 2014, Doreen Mitchell, John Mitchell, Michael Mitchell and Sonny Mitchell have appeared at interviews and examinations and willfully misrepresented their actual levels of intelligence and functioning in order to either seek benefits or ensure their benefits would continue.

13. In or about November 1978, Doreen Mitchell applied for benefits alleging visual and auditory hallucinations. During examinations related to her benefits application, examiners could not estimate her actual level of intelligence because she responded to most questions with "I don't know." She was approved for the SSI program in January 1979. When she turned 18, she underwent a Continuing Disability Review and another psychiatric examination, which revealed no medical improvement. However, it was noted that she resisted all efforts of being tested. Her disability benefits were subsequently continued. She has been her own payee for benefits since in or around 1981.

14. In or around 2004, the SSA / OIG / Cooperative Disability Investigations (CDI) Unit initiated an investigation into the Mitchell family based on an allegation that

multiple family members were receiving benefits for the same or similar conditions, as well as inconsistencies in the SSA claim files.

15. In 2004, in an interview in which the CDI unit was covertly involved, but which Doreen Mitchell believed was an interview with an SSA employee, Doreen Mitchell claimed to talk to her deceased father, but it appeared to the interviewer that it was rehearsed; and, despite alleging this disabling mental disorder, her appearance was appropriate, she was properly groomed, and she maintained good eye contact with the employee. On or around May 6, 2004, after this interview, Doreen Mitchell attended a psychiatric consultative examination, at which she did not talk much; but when she did, her speech was intelligible and there appeared to be no evidence of hallucinations or delusions. Ultimately, it was determined that she showed no evidence of a mental impairment.

16. As a result of the CDI investigation, Doreen Mitchell's benefits were ceased because she did not meet the requirements of the SSI program. Doreen Mitchell appealed the decision to terminate her benefits, and, during the appeal of this decision, she once again appeared to talk to her deceased father. However, the hearings officer noted that "her auditory hallucinations during the hearing appeared to be an act and didn't appear to be legitimate," and adopted the decision that she was not disabled "because further review of the medical and non-medical findings, testimony of the beneficiary and the hearing officer's observations do not alter the assessment." Ultimately, Doreen Mitchell appealed this decision to an Administrative Law Judge (ALJ), who ordered a consultative examination, at which Doreen Mitchell acted in such a way that the examiner believed

she had marked-to-severe emotional and cognitive regression and "difficulty coping with the demands of society and the practical demands of daily living." Based on Doreen Mitchell's presentation at this examination and a medical opinion of a physician who reviewed those findings, the ALJ found that Doreen Mitchell's disability continued and she has received SSI payments since that time.

17.  In or around December 2013, John Mitchell applied for SSI benefits. Despite previously alleging that she could not read or write in her own attempts to get benefits, Doreen Mitchell completed his Adult Function Report and, despite constantly responding to questions about her own condition with "I don't know," was the primary resource for information about John Mitchell's condition. Doreen Mitchell claimed that John Mitchell was unable to do housework or handle money, that he could only leave the house with her, and could not socialize with strangers. John Mitchell's application for benefits was referred to the CDI Unit for an investigation because of doubts regarding his actual identity, as he has no original identification, and the credibility of his alleged impairments. The referral notes that the document sent with the consultative examination reports is a photocopy of an identification card, which his cousin, Doreen Mitchell, says she found.

18.  On or about May 28, 2014, John Mitchell appeared for an interview related to this application at the SSA's Fort Worth South Office in Fort Worth, Texas. Doreen Mitchell accompanied him and was the primary informant for his medical condition. During this interview, Doreen Mitchell stated that their family wanted to put John Mitchell in a nursing home, but she made the choice to take care of him and had done so for the last six

years, including providing meals for him and taking him to the grocery store. She reported that John Mitchell did not like to communicate with anyone, communicated with spirits, and talked to his deceased mother. She also stated that neither of them could drive and that a family friend took them to the store when necessary. During the interview, John Mitchell put his feet up on Doreen Mitchell's chair and answered few questions.

19. Contrary to Doreen Mitchell's assertions and John Mitchell's presentation at the interview, John Mitchell was seen driving on or about May 20, 2014; May 21, 2014; May 22, 2014; July 11, 2014; July 17, 2014; July 18, 2014; July 21, 2014; July 22, 2014; July 27, 2014; August 1, 2014; August 6, 2014; and August 8, 2014. John Mitchell was also seen soliciting customers for on-the-spot automobile body repair on or about July 11, 2014 and August 1, 2014, and performing repair on vehicles on or about May 22, 2014; July 11, 2014; and July 27, 2014.

20. On or about July 22, 2014, Doreen Mitchell appeared for an interview related to her entitlement to SSI benefits at the SSA's Mid-Cities Field Office in Grand Prairie, Texas. John Mitchell, using the alias "Patrick Rena," accompanied her. Contrary to the previous interview in May regarding John Mitchell's benefits, where Doreen Mitchell provided most of the relevant information and John Mitchell was largely unresponsive, John Mitchell now provided most of the information regarding Doreen Mitchell's condition and her daily activities. During the interview, Doreen Mitchell appeared disheveled, actively avoided conversation, mumbled unintelligibly to herself, and claimed she could not leave the house alone. Much like Doreen Mitchell's story two months

prior, John Mitchell claimed Doreen Mitchell's brothers were institutionalized, and Doreen Mitchell's father wanted to put her into an institution too, but he would not allow it and has been caring for her for a number of years. Doreen Mitchell claimed she never went out alone, and got angry when she was repeatedly asked whether she drove. She claimed she knew how to drive, but claimed she has not driven since she hit a parked car; John stated this incident occurred a few years prior.

21. Despite these assertions and her presentation at this interview, later that same date, Doreen Mitchell was seen walking with two children who appeared under the age of 18. Together, these three walked approximately one mile down a fairly busy road, waited appropriately at the crosswalk and pressed the button for a walk sign. On July 29, 2014, Doreen Mitchell was again observed walking around the block near her address with two juvenile females, and later driving and shopping at a Liberty Shoe Warehouse and Thrift Town with the two juvenile females and another adult. On August 6, 2014, she was followed to the Dallas First Church, where John Mitchell and the two juveniles accompanied her, and was seen sweeping the floors of the building at the church where they were gathering. On August 10, 2014, Doreen Mitchell drove herself to the same church – approximately 20 miles from her address – where she remained for a couple of hours. On December 22, 2014, Doreen Mitchell drove to a DD's Discounts and Dollar Tree with the same two children and appeared to make purchases at both stores. On January 16, 2015, Doreen Mitchell was followed to a funeral home in Irving, Texas and was observed placing tablecloths on the tables delivered for an evening gathering, serving food at the gathering, and socializing with friends and family. Finally, on February 20,

2015, Doreen Mitchell was followed alone to a Kroger grocery store near her residence where she purchased over-the-counter liquid medicine. As she was able to leave the house unaccompanied, drive, care for children, and socialize with large groups of people, Doreen Mitchell clearly demonstrates a higher level of functioning than she related to the SSA.

22. On or about July 21, 2015, Doreen Mitchell appeared for a consultative examination with Dr. Alicia Coleman for the purpose of determining her continued right to disability benefits. Doreen Mitchell was dressed in a dirty, somewhat transparent nightgown with visible black undergarments and a scarf sloppily tied around head. She displayed poor hygiene, and her speech was choppy with a hostile tone and loud volume. Doreen Mitchell made statements such as "I don't like to see nobody or go nowhere" and "the lady told the judge a long time ago, medication doesn't help me." When asked about her activities of daily living, she stated she was independent in self-care activities, but did not have a driver's license, either walks or relies upon Patrick Rena for transportation, and that Patrick Rena buys her groceries. When asked about a typical day, Doreen Mitchell responded, "just stay home, nothing." Doreen Mitchell frequently stated she wanted to go home and "I won't see no more judges." When asked, Doreen Mitchell did not know the current date, which city she was in, or which floor of the building she was on, but knew that she was in the state of Texas.

23. Given her effort, Dr. Coleman determined that her presentation during this assessment was not judged to be a valid representation of her true level of functioning. Further, because there were discrepancies between previous reports of her functional

ability and her stated current functional ability, along with her presentation during the evaluation, Dr. Coleman felt Doreen Mitchell was engaging in impression management and was given a code for malingering to account for an attempt on her part to feign or over-exaggerate her issues for secondary gain.

24. Doreen Mitchell has a State of Texas identification card (ID #16048721), which expires on August 29, 2020. Doreen Mitchell used a California identification card (ID #C1923179) as proof of her identity when applying for her identification card.

25. John Mitchell has never been issued a State of Texas driver's license or identification card. At his consultative examination, John Mitchell provided a State of Texas identification card, which displayed his name and address of 3750 Wayside Avenue, Fort Worth, Texas 76110. The identification card number (ID# 37862361) was verified through the Texas Department of Public Safety (DPS); however, the identification card number was issued to a female with a completely different name. As such, I have reason to believe that John Mitchell has additional fraudulent identity documents in his home.

26. Patrick Rena has a State of Texas identification card (ID #21048613), which expired February 2, 2010. Patrick Rena used an Arizona driver's license, a Sam's card and fishing license as proof of his identity when applying for his identification card. The Texas DPS also advised that Patrick Rena was initially issued an identification card (ID #21048612), but his name was misspelled and the identification card was voided.

27. SA Brandon Bowron, SSA / OIG, Phoenix, Arizona, provided information from the Arizona Department of Transportation / Motor Vehicle Division, which shows that

Patrick Rena obtained a driver's license (DL# 593271976) on October 10, 2003. His license expires on February 20, 2028. The person in the Arizona driver's license is the same person who has represented himself as both John Mitchell and Patrick Rena to SSA.

28. Subpoenaed records from Bank of America disclosed the following information:

  1. Patrick Rena, using Social Security Number (SSN) 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, has two "Regular Savings" accounts (account #s 004781738273 and 488028354075) and a "Regular Checking" account (account # 488021950023). The accounts were opened on March 4, 2004, March 13, 2010, and January 16, 2010, respectively. He is the only signatory on the accounts.

  2. Doreen Mitchell has a "Regular Savings" account (account # 004773533062), which was opened on December 9, 1999. She is the only signatory on the account. Doreen Mitchell's Social Security disability benefits are deposited into this account.

29. Subpoenaed records from Santander Consumer USA disclosed that Patrick Rena obtained an automobile loan using SSN 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, and that the account for his Ford F-150 truck (VIN: 1FTEX1C80AFC96435) was in default. Additionally, on an undated credit application, Patrick Rena stated that he was currently employed by Allstate as a full-time Field Manager, and had been for ten years. His employer's phone number is listed as (817) 449-4483. Patrick Rena claimed to have a monthly gross income of $5,000, and claimed to live with relatives paying nothing for rent. Since she lives with John Mitchell, Doreen Mitchell should have disclosed this gross income to the SSA, but has failed to do so. Based on my training and experience, I know that individuals will

have pay stubs, work credentials, paperwork, or other documentation related to that employment, and I therefore expect to find such documentation related to John Mitchell at the PREMISES.

30. Further, because John Mitchell has identification cards, holds bank accounts, and has obtained lines of credit using the fraudulent identity of Patrick Rena, based on my training and experience, additional documents and records associated with this identity are likely to be found at the PREMISES.

31. Additionally, John Mitchell has been observed soliciting customers for on-the-spot automobile repair and performing those repairs for cash. As Doreen Mitchell lives with John Mitchell, any income he earns working should be reported to the SSA. I have reason to believe, based on John Mitchell's work activity, that evidence of that work activity, including funds, ledgers, or other records, will be found at the PREMISES.

32. In interviews with the SSA, Doreen Mitchell and John Mitchell have both alleged that they require assistance shopping and did not like to leave the house. On July 21, 2015, Elrod's Cost Plus Supermarkets provided a copy of surveillance footage from that day, and an employee advised that Doreen Mitchell has been a customer for five years. She and John Mitchell are regular customers and pay with cash and/or food stamps. Based on my training and experience, as well as common knowledge, I know that individuals are provided receipts upon making a purchase and have reason to believe that receipts of this and other transactions may be found at the PREMISES, which would corroborate my belief that both John Mitchell and Doreen Mitchell shop and leave their home more frequently than was alleged to the SSA.

33. Since surveillance of the Mitchell family began in or around May 2014, investigators have noted that, despite alleging they were unable to drive, John Mitchell has had one vehicle registered in his name, "Patrick Rena" has had two vehicles registered in his name, and Doreen Mitchell has been frequently seen driving the vehicle registered to John Mitchell.

34. Western Union records show numerous financial transactions affiliated with Michael Mitchell, Sonny Mitchell, and John Mitchell over the last five years. Some of the transactions are over $20,000 and have been sent to overseas locations.

35. Additionally, Doreen Mitchell and John Mitchell have presented themselves to the SSA that they cannot associate with others, read or write, and are dependent on others for assistance. As surveillance indicates that both enjoy a much higher level of functioning, there is reason to believe that the PREMISES may contain evidence that neither Doreen Mitchell nor John Mitchell is as mentally deficient or unable to associate with others as they have presented to the SSA, including items such as books, written correspondence, photographs of social activities, and recreational items, in addition to the evidence or proceeds of work activity already discussed above.

36. Doreen Mitchell has been observed using a cellular telephone, and it is believed one will be found at the PREMISES. As described in Attachment B, this application seeks permission to seize computers, cellular phones and other items where documents may be stored electronically. I submit that if a computer, cellular phone or electronic medium is found on the premises, no attempt will be made to search such a device and a

separate affidavit will be submitted to search any devices seized that may contain evidence of an offense.

37. At the conclusion of the criminal investigation and any related criminal proceedings, the government will make reasonable efforts to return all data and data storage devices to the owner, except for any data or data storage devices which are contraband or instrumentalities of crime under federal or state law or which have been forfeited under federal or state law.

## CONCLUSION

38. I submit that this affidavit supports probable cause for a warrant to search the PREMISES and seize the items described in Attachment B.

_____
CYNTHIA M. ROBERTS
Special Agent
SSA/OIG

Subscribed and sworn to before me on this 25 day of September 2015

_____
PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE

ATTACHMENT A

Residence located at 405 Bryan Drive, Arlington, TX, 76011 further described as a one-story white dwelling, with an attached carport. The front of the residence faces south. The number "405" is depicted on a post along the front porch.



ATTACHMENT B

All items, records, and information relating to violations of 42 U.S.C. § 1383a(a)(3), including the following:

A. FINANCIAL DOCUMENTS:
   1. Books, records, receipts, notes, ledgers, bank records, money orders, and other papers related to the above-described offense, including foreign and domestic bank records, such as those from the country of Jamaica;
   2. Books and records and documents related to the existence of assets;
   3. Books, records, receipts, documents, or ledgers related to the existence of work activity performed by John Mitchell;
   4. General ledgers, currency, cash receipts and disbursement journals and statements which may be stored manually (on paper) related to monetary transactions involving SSA benefits.

B. IDENTIFICATION:
   1. All identification documents and items in the name of, or in close variations of the names of the following individuals, who appear in documents related to Doreen Mitchell's SSI benefits: Doreen Mitchell, John Mitchell, Michael Mitchell, Sonny Mitchell, Patrick Rena, Doreen Adams, Dinah Adams, Mike Mitchell, Sandra Davis (Sandra Mitchell or Katie Mitchell), and Scarlet Ellington.
   2. Any other identification documents that bear the photographs of Doreen Mitchell, John Mitchell, Michael Mitchell and Sonny Mitchell, including driver's licenses, state identification cards, Social Security cards, Medicaid cards, debit cards, bank cards, credit cards, western union cards, birth certificates, and letters.

C. ITEMS OF VALUE AND ASSOCIATED DOCUMENTS:
   1. Currency (United States currency or foreign currency), financial instruments, precious metals, and jewelry.
   2. Bank records, titles or deeds for real or personal property, promissory notes, or other documents related to financial transactions such as those for obtaining, transferring, storing, depositing, investing, laundering, concealing, or expending money.

D. OTHER ITEMS:
   1. Any and all vehicle documents, including titles and registrations; property documents; legal documents; tax documents; employment documents; items of mail, utility bills, insurance documents, other government documents and documents of private institutions that bear the names of, or

close variations of, the names of Doreen Mitchell, John Mitchell, Michael Mitchell, Sonny Mitchell and Patrick Rena.

2. Any and all documents related to claims for Social Security disability or issued by the Social Security Administration.

3. Telephone records, in whatever form, which evidence of long distance phone calls.

4. Any tools, signage or training manuals associated with automobile repair or an automobile repair business.

E. ELECTRONICS: Cellular phones, mobile phones, blackberries, pagers, computer hardware, meaning any and all computer equipment and peripheral devices. Included within the definition of computer hardware, but not all inclusive, is any electronic device capable of data processing (such as central processing units, laptop or notebook computers, personal digital assistants, and wireless communication devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media); related communications devices (such as modems, cables and connections); digital media (such as cameras), storage media, and security devices, which will be seized and searched with an additional warrant. The following definitions apply to these terms as set out in this attachment:

1. A cellular telephone or mobile telephone is a handheld wireless device used primarily for voice communication through radio signals. These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other cellular telephones or traditional "land line" telephones. A cellular telephone usually includes a "call log," which records the telephone number, date, and time of calls made to and from the phone.

2. In addition to enabling voice communications, cellular telephones now offer a broad range of capabilities. These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Cellular telephones may also include global positioning system ("GPS") technology for determining the location of the device.

3. "Blackberry" is a brand of handheld wireless electronic communications devices made by Research in Motion. Blackberries generally enable users to send email, make and receive telephone calls, access the Internet, and organize appointments and contact information. Certain Blackberries can also send instant messages, take digital pictures or moving video, or store and play digital music or

video files. Blackberries may also contain GPS technology for determining the location of the device.

4. A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

5. A digital camera is a device that records still and moving images digitally. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

6. A portable media player (e.g. MP3 Player and iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photograph files. However, a portable media player can also store any digital data, such as word processing documents, even if the device is not designed to access such files. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

7. A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as a wireless communication device and are used to access the Internet and send and receive email. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.